UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------

----------x

SUSAN BARON,

        Plaintiff,

     -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION and CITY OF NEW YORK,

        Defendants.

--------------------------------------------

------------x

**MEMORANDUM AND ORDER**

Case No. 06-CV-2816 (FB) (MDG)

*Appearances*
*For the Plaintiff:*
MICHAEL G. O'NEILL, ESQ.
30 Vesey Street, Third Floor
New York, NY 10007

*For the Defendants:*
MICHAEL A. CARDOZO, ESQ.
Corporation Counsel of the City of New York
By: JAMIE M. ZINAMAN, ESQ.
    Assistant Corporation Counsel
100 Church Street
New York, NY 10007

**BLOCK, Senior District Judge:**

        Plaintiff, Susan Baron ("Baron"), alleges that defendant, New York City Department of Education ("DOE"), terminated her from its Teaching Fellows Program ("the Program") based on her age, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-34. DOE moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted.

**I**

        The following undisputed facts are taken from the parties' Rule 56.1 statements:

        The Program provides education and training – culminating in a teaching certificate – for those wishing to teach in New York City's public schools. Baron was accepted into the program on March 9, 2004. According to records produced by DOE, Baron was one of 1907 fellows

in 2004; of the 1774 for whom age data are available, 87% (1545/1774) were below the age of 40, while 13% (229/1774) were 40 or above. Baron was 47 years old in 2004.

**A. Baron's Pre-Service Training**

Each teaching fellow must complete "pre-service training" consisting of three components: master's-level coursework, sessions with a Fellow Advisor ("FA"), and a "hands on" field placement at a local school. Each fellow is assigned to a cohort of other fellows, who take classes and attend workshops together.

Baron's pre-service training took place over the summer of 2004; her FA was Petra Wiehe ("Wiehe"). She was initially assigned to a cohort taking classes at Mercy College in the Bronx; however, she asked the Program's staff if she could be reassigned to a college in Manhattan. The request was granted and Baron was notified by email that she would be reassigned to a cohort taking classes at Hunter College ("Hunter"). Baron did not check her email, however, and missed the first day of classes.

Although Baron attended classes for the remainder of the term, she was not officially registered at Hunter and, as a result, was not able to gain access to Hunter's library and computer lab. At her deposition, Baron asserted that Hunter's Teaching Fellows Coordinator, Joyce Silvershein ("Silvershein"), was responsible for her registration, but that Silvershein "[n]ever had any intention of registering [her]" because "they decided within seven to 10 days that I was no longer in the program." Decl. of Jamie M. Zinaman (Sept. 19, 2009), Ex. D at 93. According to Silvershein, Baron could not be registered because she never submitted a personal statement, a required part of her application materials, *see id.*, Ex. Q; Baron does not dispute this.

**B. The June 30th Meeting**

During the first week of her pre-service training, Baron's instructors at Hunter

expressed concern that she "was disrespectful to her fellow students and participated in a way that dominated class discussion in a negative way." Zinaman Decl., Ex. Q. Program officials met with Baron on June 30, 2004, to address these concerns; the attendees were Baron, Wiehe, Silvershein and two Program staff members, Andie Corso ("Corso") and Amy Way ("Way").

A memorandum used as the agenda for the two-hour meeting stated that Baron was "not currently making satisfactory progress toward the completion of pre-service training," Zinaman Decl., Ex. F; more specifically, the memo stated that "Susan's interactions with staff and other Fellows have raised concerns regarding Susan's ability to meet three key performance indicators: appropriate response to environment, problem solving and professionalism." *Id.*

Way's notes of the meeting, which were incorporated into the memorandum and given to Baron, reflect that Program officials addressed each area of concern and suggested ways Baron could improve:

- "Stay on point in FA Session/Coursework. Make clear connections to the topic of conversation. You will know that you are succeeding if no Fellows interrupt you or cut you off."

- "Be accountable for all information sent in messages. This will require you to be pro-active in seeking information."

- "Make sure that you are listening twice as long as you speak."

- "Be aware of the expectations that others have in the school and university culture."

- "Interact with everyone in a respectful and controlled way. Take care that your tone is not hostile or defensive. We will be checking in with your professor and FA and other people with whom you interact...."

*Id.*, Ex. L. According to Way's notes, Baron responded by "deflecting blame" and saying that she was "not able to get a heads up." *Id.*, Ex. K. She also mentioned that she had "no access to computers," *id.*; in response, it was suggested that "she use the computer lab in the Teaching Fellows office, go to a public library [or] use the computer in Hunter College." *Id.*, Ex. F at 30.

At her deposition, Way testified that Baron seemed to understand the Program's concerns, but that "her response to them was extreme." *Id.*, Ex. F. at 35. Way's observation was borne out by Baron's own deposition testimony: When asked about the suggestion that she try to stay on topic, Baron stated that she was "not allowed to speak or interact or participate whatsoever in class." *Id.*, Ex. D. at 73. She testified that she was told, "If you ever speak under any circumstances whatsoever whether it be in a lady's room, in the hallway, if you're ever talking and somebody walks up and interrupts your conversation, you're fired." *Id.*

## C. Baron's Evaluations

Wiehe evaluated Baron at two points during her pre-service training. In an evaluation dated July 9, 2004, she rated Baron as "satisfactory" in all categories except "participation," for which she gave her an "unsatisfactory"; Wiehe's overall evaluation was "satisfactory." In her second evaluation, dated August 6, 2004, Wiehe rated Baron as "unsatisfactory" in both "participation" and "professionalism," and changed her overall evaluation to "unsatisfactory."

Baron was also observed and evaluated at her field placement, which took place at PS 57 in East Harlem. Wiehe observed Baron at the beginning of her placement (the exact date is not clear from the record); she reported that Baron "seemed fine" and that the cooperating teacher – the teacher with whom Baron was working – "seemed neutral on her." Zinaman Decl., Ex. O. Way then observed Baron on July 19, 2004; she reported that Baron "seemed OK," although she had tried to talk to Way "while the coop[erating] teacher was explaining something to the class," which Way felt "wasn't exactly appropriate." *Id.*, Ex. I.

On August 3, 2004, Wiehe observed Baron a second time, reporting that she "seemed (again) fine, circulating around the room to help students." *Id.*, Ex. O. Wiehe also noted, however, that three of the cooperating teachers with whom Baron had been working said that "they wouldn't wan[t] their children/students in her class, that she is 'out of it,' and not aware of her role," *id.*; a fourth stated that "she was all right, that she would do fine as a resource teacher or push-in teacher." *Id.*

In response to the cooperating teachers' concerns, the Program sent a "field liaison," Judy Schleifer ("Schleifer"), to conduct yet another observation on August 4th. Schleifer reported that the school's assistant principal, Lorraine Hastey ("Hastey"), had expressed "serious concern" about Baron, stating that she was "very excitable" and seemed "more focused on completing [H]unter's assignments than on working with the cooperating teachers." *Id.*, Ex. P. Schleifer noted that Baron "was typing on her laptop!!!!!" and "didn't interact with students at all during my visit." *Id.* According to Schleifer's report, Baron complained to her that the school was "not allowing her to properly complete her assignments" and that her cooperating teachers had "tried to take advantage of her." *Id.* Based on these observations, Schleifer concluded that Hastey's concerns were "warranted." *Id.*

Hastey's formal, written evaluation of Baron essentially reiterated her comments to Schleifer:

> Susan Baron appeared to be overly dramatic at times. I was concerned about her ability to demonstrate coherent instructional planning and the implantation [sic] of pedagogical strategies. She placed more concern on completing Hunter's course work rather than interaction with cooperating teacher and participation and engagement within the learning environment.

*Id.*, Ex. G. Hastey gave Baron "satisfactory" marks in "Attendance/Promptness," "Interactions with Students," "Solution Oriented/Ability to Solve Problems" and "Classroom Participation," but gave her "concern" marks (the only other rating) in "Interaction with Cooperating Teacher/Admin," "Participation/Engagement," "Professional Appearance" and "Sense of Perspective." *Id.*

Finally, the Program received input from Hunter. Although Baron passed all of her classes, Silvershein and another Hunter official, Kate Garnett ("Garnett"), gave a less positive assessment of her temperament:

> After the intervention [i.e., the June 30th meeting] she rarely participated. Susan overreacts to problems and seems overwhelmed. She has more than once gone directly to the Dean of Education's Office instead of coming to the Teaching Fellow's Office to get help with an issue as all of the other fellows have done.

*Id.*, Ex. Q. Silverschein and Garnett further stated that "[o]thers in her cohort have expressed some concern about her behavior[,] using the word bizarre." *Id.* At her deposition, Baron testified that the other Fellows in her cohort had denied saying anything negative about her. *See id.*, Ex. D at 74-75.

**D. The Termination Decision**

At her deposition, Way testified that "typically . . . about a hundred people" in the Program fail their exams; those individuals are terminated as a matter of course. Zinaman Decl., Ex. F at 51. In addition, the Program convened a committee to "discuss all of the Fellows who had raised concerns, who had received unsatisfactory evaluations by either their field placement, the Fellow advisor or their university." *Id.*, Ex. F at 56. According to DOE's records, 26 fellows were flagged due to unsatisfactory evaluations (as opposed to test scores); of the 23 for whom age data are available, 70% (16/23) were below age 40 in 2004, while 30% (7/23) were 40 or above.

The committee met during the first or second week of August 2004; it consisted of Way and Corso, joined by Vicki Bernstein ("Bernstein"), the Program's director, and Tim Daly, a program manager at the New Teacher Project, a non-profit organization that contracted with DOE to develop the criteria and training process for the Program.

According to Way, the decision to flag a fellow for discussion was a "holistic" one based on formal evaluations and informal comments received during the pre-service training period, *id.*, Ex. F at 60-61. At some point, Way "made the recommendation to remove [Baron]" and, after discussion based on "all the evidence at hand," that recommendation was adopted. *Id.*, Ex. F at 58-

59.  According to DOE's records, the committee decided to terminate a total of 12 fellows based on their subjective evaluations; of the 11 for whom age data are available, 45% (5/11) were below age 40, and 55% (6/11) were 40 or above.

On August 26, 2004, Bernstein sent Baron a letter informing her that she had "received an unsatisfactory final evaluation of your performance in the pre-service training program" and, accordingly, was "being removed from the Fellowship, effective immediately."  *Id.*, Ex. R.  Baron apparently did not receive the letter because she arrived at Hunter for the first day of the fall semester; when told that she was no longer in the Program, she was "very distraught and confused about her status."  *Id.*, Ex. I.  She called Way, who read the termination letter to her over the phone; Baron responded that "her lawyer will be in contact with [the Program] and...hung up on [Way]."  *Id.*

## E.  Procedural History

On June 17, 2005, Baron timely filed a charge of age and disability discrimination with the United States Equal Employment Opportunity Commission, which dismissed her charge and issued a "right to sue" letter on March 6, 2006.  On June 5, 2006, she timely instituted the present action against DOE and New York City.  In her complaint, she reiterated her claims of age and disability discrimination, and added a claim that her termination from the program violated due process; however, she subsequently withdrew the latter two claims and voluntarily dismissed New York City as a defendant.  Thus, only Baron's claim for age discrimination against DOE remains.

## II

The sole question before the Court is whether Baron has adduced sufficient evidence to raise a genuine question of fact as to whether she was terminated from the Program based on her age.  In resolving this issue, the Court is mindful that, in the context of a summary judgment motion,

it "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the motion." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"Claims under the ADEA are governed by the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, [411 U.S. 792 (1973)]." *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194-95 (2007).[1] The Second Circuit recently described that framework as follows:

> [T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination. . . . If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action . . . . If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.

*Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (citations and internal quotation marks omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "[I]n attempting to satisfy this burden, the plaintiff . . . must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

---

[1]The Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349 n.1 (2009). The Second Circuit has, however, and *Gross* – which held that the plaintiff in an ADEA case must prove *at trial* "that age was the 'but-for' cause of the challenged adverse employment action," *id.* at 2352 – in no way calls cases like *D'Cunha* into question.

were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 253).

## A. *Prima Facie* Case

"To achieve [a] prima facie case [under the ADEA], a plaintiff must show membership in the protected age group, qualifications for the jobs at issue, an adverse employment action, and that the adverse action occurred under circumstances giving rise to an inference of discrimination." *D'Cunha*, 479 F.3d at 195. It is undisputed that Baron was a member of a protected class at the time of her termination, *see id.* at 194 ("The ADEA prohibits discrimination . . . against persons aged 40 or older." (citing 29 U.S.C. §§ 623(a)(1), 631(a))), and that her termination qualifies as an adverse employment action. DOE argues that her unsatisfactory performance during pre-service training precludes her from satisfying the second element, but the Second Circuit has made it clear that a plaintiff "need only make the minimal showing that she possesses the basic skills necessary for the performance of the job." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (citations, internal quotation marks and alteration omitted). That Baron was accepted into the Program demonstrates that she met its minimum qualifications, *see id.* ("In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualifications is, of course, easier to draw . . . because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified."); any issues about her performance bear only on the post-*prima facie* aspects of the *McDonnell Douglas* framework. *See id.* ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").

Thus, Baron's ability to state a *prima facie* case of discrimination turns – as it does

in so many cases – on the fourth element. In that regard, she relies heavily on the statistics cited above. It is certainly true that those statistics reveal disparities in the relative "termination rates" of older and younger fellows: Of the 1545 fellows known to be under 40, approximately 1% were flagged due to their evaluations; by contrast, 3% of fellows 40 or over were flagged. Similarly, only 0.3% (5/1545) of the under-40 contingent were ultimately terminated for subjective reasons, compared to 2.6% (6/229) of the fellows 40 and over.

"Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of *a pattern or practice* of discrimination." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) (emphasis added). Thus, in *Sorlucco v. New York City Police Dep't*, 971 F.2d 864 (2d Cir. 1992) – which Baron cites – the Second Circuit affirmed a jury verdict finding a pattern or practice of gender discrimination based, in part, on statistical evidence. *See id.* at 871 ("Over 10% of the thirty-five probationary officers disciplined were women. One hundred percent of that group was terminated by the department. In contrast, approximately 63% of the men who were disciplined were ultimately fired."). Statistics alone are also usually sufficient to make out a *prima facie* showing of liability in a disparate-impact case, in which "plaintiff alleges that an entire class or category of minority workers are adversely affected by an employer's facially neutral policy." *Hudson v. International Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980).[2]

This case, however, is neither a pattern-or-practice nor a disparate-impact case; rather, it presents an individual claim of disparate treatment. As the Court has previously observed,

_____

[2]As the Supreme Court's recent decision in *Ricci v. DeStefano*, ___ U.S. ___, 2009 WL 1835138 (June 29, 2009), makes clear, a statistical disparity is only the "threshold showing" in a disparate-impact case: "[T]he City could be liable for disparate-impact liability only if the examinations were not job related and consistent with business necessity, or if there existed an equally valid, less-discriminatory alternative that served the City's needs but that the City refused to adopt." *Id*. at *18.

11

"[s]tatistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she *in particular* has been discriminated against." *Drake v. Delta Air Lines, Inc.*, 2005 WL 1743816, at \*6 (E.D.N.Y. July 21, 2005) (citing *Hudson*, 620 F.2d at 355 (2d Cir. 1980)), *aff'd,* 216 Fed. App'x 95 (2d Cir. 2007); *see also Martin v. Citibank, N.A.*, 762 F.2d 212, 218 (2d Cir. 1985).

Nevertheless, statistical evidence can be probative and, when coupled with other evidence of discriminatory animus, may be sufficient to establish a *prima facie* case. *See Drake*, 2005 WL 1743816, at \*7 (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999), and *Stratton v. Department for the Aging for New York*, 132 F.3d 869, 877 (2d Cir. 1997)). In that regard, Baron offers two potential "plus factors." She argues that Wiehe, her FA, made negative comments about older fellows: " Plaintiff's advisor joked about students giving heart attacks to older teachers, and

suggested that older candidates should find other work to do." *See* Pl.'s Mem. of Law at 10. Although Wiehe had no direct role in the decisio

n to terminate Baron, it is undisputed that her evaluations were considered by the actual decisionmakers; under the so-called "cat's paw"

theory of liabilit y, "the imper missibl e bias of a single individ ual can infect the entire group of collecti v e decisio nmaker s," *Jamies on v.*

*Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 474 (S.D.N.Y. 2002), at least when the decisionmakers are overly deferential to the biased

individual's recommendations. *See, e.g., Fullard v. City of New York*, 274 F. Supp. 2d 347, 357 (S.D.N.Y. 2003) ("[T]he employer will be liable

where the decision-maker 'rubber stamps' the recommendation of [biased] subordinates; in such cases, we say that the decision-maker acts as

a conduit of the subordinates' improper motive." (citations, internal quotation marks and citations omitted)).

Baron also notes that two fellows under 40 received arguably similar evaluations from their FA, but were retained; "[a] showing of disparate treatment that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected

group' – is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case...." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Considering the record as a whole, the Court concludes that Baron has made out her *prima facie* case.

## B. Legitimate, Non-Discriminatory Reason

To satisfy its burden of showing "some legitimate, non-discriminatory reason for its action," *Holcomb*, 521 F.3d at 138, DOE relies on the numerous negative comments and evaluations of Baron's performance. Baron argues that DOE "has utterly failed to meet [its] obligation, because its explanation consists of nothing more than reciting those alleged shortcomings that caused plaintiff to be part of the small group considered for termination." Pl.'s Mem. of Law at 7. Notwithstanding Baron's objection, Way clearly testified that the decision to terminate Baron was a "holistic" decision made based on "all the evidence at hand," Zinaman Decl., Ex. F at 58-59; there is no evidence that this was not the case.

## C. Pretext

As noted, the third stage of the *McDonnell Douglas* framework requires the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The Supreme Court has held that "a reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotations omitted; emphasis in original). Nevertheless, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive." *Reeves*, 530 U.S. at 147. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated," *id.* at 148 (emphasis added); on the other hand, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* The Second Circuit has held that "the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves*, 530 U.S. at 143).

To show pretext, Baron again relies on Wiehe's comments and the alleged disparate treatment of similarly situated younger fellows. *See Collins v. New York City Transit Auth.,* 305 F.2d 113, 118 n.1 (2d Cir. 2002) (noting that issues regarding fourth element of *prima facie* case and pretext "tend to collapse as a practical matter under the *McDonnell Douglas* framework"). Although those "plus factors" were sufficient to create a presumption of discrimination sufficient to require DOE to come forward with a legitimate, non-discriminatory reason, they are more problematic now that the presumption has "drop[ped] out of the picture." *Hicks*, 509 U.S. at 511.

With respect to the younger fellows who were retained despite negative comments from their FA, meaningful comparisons are possible only if the plaintiff "show[s] she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d 34 at 39 (quoting *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997)). As DOE points out, a fellow's performance is based only in part on the FA's evaluation; each fellow must also perform well in his or her field placement. There is no evidence that Baron's

proposed comparators received negative evaluations – as Baron did – from the cooperating teachers or administrators at their field placements. Indeed, a field placement evaluation for one of the comparators noted that "he has the potential to be a fine high school teacher, but will not make it if he fails to be punctual." Def.'s Reply Mem. of Law, Ex. A. This stands in stark contrast to the statements of three of Baron's cooperating teachers that "they wouldn't wan[t] their children/students in her class." Zinaman Decl., Ex. O.

That FA evaluations make up only a portion of a fellow's file also negates any inference that the committee that made the termination decision was tainted by Wiehe's alleged bias. It is clear that the committee did not merely "rubber stamp" Wiehe's views because it also considered negative evaluations and comments from at least four other individuals – Shleifer, Hastey, Silvershein and Garnett. Even assuming that Wiehe made the ageist comments attributed to her, there is no evidence that Baron's other evaluators acted with discriminatory animus.

Taking the record as a whole, the Court concludes that Baron has failed to carry her ultimate burden of raising a genuine issue that her age – as opposed to her performance – was the true reason for her termination from the Program.

**III**

For the foregoing reasons, DOE's motion for summary judgment is granted and

Baron's complaint is dismissed.

**SO ORDERED.**


_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 7, 2009